| | |
|---|---|
| _____ : | |
| SUZANNE GLICKLIN, : | |
| : | |
| Plaintiff : | |
| : | |
| v. : | |
| : | |
| T.D. BANK., T.D. Bank, N.A., : | |
| : | |
| Defendant : | **JURY TRIAL DEMANDED** |
| _____: | |

## COMPLAINT

## I.   PRELIMINARY STATEMENT

1.      This is Plaintiff Suzanne Glicklin's ("Ms. Glicklin") Complaint against her former

employer, Defendant T.D. Bank and T.D. Bank, N.A. ("T.D. Bank" or "the bank"), for

unlawfully discriminating against her and for retaliating against her in violation of the

Connecticut Fair Employment Practices Act ("CFEPA"), the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 and 12102 and the Connecticut Fair Employment Practices Act

("CFEPA"), C.S.G.A.§§46a-60(a)(1), the Family and Medical Leave Act (FMLA) and the

Connecticut Family Medical Leave Act (CTFMLA), and for failure to pay wages in violation of

the Fair Labor Standard Act (FLSA) and the Connecticut Wage and Hour Law, and for hostile

work environment and negligent and intentional infliction of emotional distress.

## II.   PROCEDURAL PREREQUISITES

2.      On February 2, 2018, Plaintiff filed a "dual charge" of discrimination against Defendants

with the Connecticut Commission on Human Rights and Opportunities (CHRO) and the United

States Equal Employment Opportunity Commission (EEOC).

3.     On February 20, 2019, Plaintiff received a Notice of Right to Sue letter from the EEOC regarding charge number 523-2018-00639.  (See **Exhibit A**).

4.     On February 19, 2019 Plaintiff received a Release of Jurisdiction from the CHRO regarding charge number No. 1820328. (See **Exhibit B**).

### III.     PARTIES

5.     Plaintiff, Suzanne Glicklin is a resident of the State of Connecticut, resides in Trumbull, Connecticut and was employed by and worked out of Defendants' bank in their Norwalk, Westport, and Bridgeport, CT branch/store/office locations.

6.     Defendant, T.D. Bank is a US bank with approximately 70 branches/stores/offices in CT.

### IV.     STATEMENT OF FACTS

7.     Plaintiff is currently 57 years old and her date of birth is ########, 1961.

8.     Plaintiff was employed with T.D. Bank as a Store Manager. She began her employment with T.D. Bank on October 12, 2009 as a Store Manager and her employment ended on December 1, 2017.  Plaintiff received salary increases each year from January of 2010 through January 2017.  Plaintiff has at all times been very qualified for her job.  Her former supervisor was Kevin Taylor, Regional Market Manager ("Taylor").

9.     In March of 2013, Plaintiff's daughter, then age 14, was hospitalized for depression and suicidal ideation. She was hospitalized twice between March and April of 2013.  Her daughter attended outpatient therapy daily for six weeks and as a result, Plaintiff took an FMLA leave for five weeks to provide caretaking, transportation and emotional support.  Plaintiff returned to work in the end of May 2013.

10.    After Plaintiff returned from FMLA leave for her daughter, she still had to leave work at times in order to drive her daughter to doctor and therapist appointments.  All the appointments

were scheduled well ahead of time and Taylor knew the reason for these intermittent and brief absences. Typically, Plaintiff would arrive at work early at 7:00 am and then leave at 3:00 pm on Wednesdays when she worked in Norwalk in order to take her daughter to therapy. Plaintiff continued this Wednesday schedule after she was transferred to the Defendant's Bridgeport location.

11.     In October 2013, Plaintiff was scheduled to meet with Taylor for a routine one-on-one meeting. The calendar invite in Outlook sent by his administrator stated that the meeting would be in Plaintiff's office in Norwalk. Taylor mistakenly thought the meeting was in Bridgeport and requested to reschedule at 3:00 pm on a Friday. When Plaintiff then arrived in Bridgeport, several managers expressed surprise that Plaintiff had her "one-on-one" on a Friday afternoon. Plaintiff explained that Taylor got the locations mixed up and that they had to reschedule from Thursday. Their meeting on Friday seemed to go fine, but when Plaintiff came in to work first thing Monday morning, she received an e-mail from Taylor stating that she needed to meet with him and that they were going to have a telephone meeting with Human Resources and go into a "deep dive" regarding her sales numbers.

12.     Plaintiff and Taylor then met in the Westport location where Taylor conferenced in the HR generalist, Cheryl Weagraff, on the telephone. Plaintiff could tell that Taylor was angry. Taylor then grilled Plaintiff about her sales numbers with the HR representative on the phone. The meeting felt tense and uncomfortable.

13.     After Cheryl Weagraff hung up, Taylor started saying to Plaintiff that he did not lie about the meeting location and that Robert Van Zandt mixed up the locations, not him. Plaintiff then realized that the whole purpose of this meeting with HR on the phone was for him to retaliate

against her for telling someone that he made a mistake about their meeting location the prior week.  There was no discussion or concern about her sales numbers the prior business day.

14.  On December 23, 2013, Plaintiff received an e-mail informing her that she would need to meet with Taylor on December 26, 2013. At that meeting, Taylor told Plaintiff that he was transferring her to the Bridgeport Store on Lafayette Boulevard effective January 13, 2014.  This location in Bridgeport is also where Taylor's office is located.

15.  Plaintiff managed the Norwalk Store at 380 Main Ave for four years.  That location had a deposit base of over $150mm and had an FTE (full-time employee count) of 11. The Bridgeport location where Plaintiff was being transferred had an FTE of 6 and a deposit base of $37mm.

16.  Plaintiff's replacement in Norwalk was Leonardo Sanchez. On information and belief, he was then approximately 30 years old.

17.  In the first four years that Plaintiff had been with T.D. Bank, she heard rumors on three different occasions from unrelated sources that Taylor had sexual relationships with a number of employees in the Fairfield Region while he was the Regional Operations Officer.  (This would have been a conflict of interest and a violation of T.D. Bank policy because a Regional Operations Officer is essentially an internal auditor).  Plaintiff mentioned to Marie-Marthe Philitas, who was the Assistant Store Manager in Norwalk, (and someone with whom she worked closely for two years) that she had concerns that there may be favoritism shown to certain employees in Bridgeport.  Plaintiff informed Marie-Marthe Philitas that if Plaintiff saw evidence of this, she would report it to Taylor's supervisor.

18.  One act of favoritism Plaintiff observed was that the Assistant Store Manager in Bridgeport had been promoted from an Administrative Assistant (with no retail banking, management, or supervisory experience) to the Assistant Store Manager.  On information and

belief, Taylor promoted her even though she did not have the experience or skill set necessary for the job.

19.     Plaintiff transferred to Bridgeport effective January 13, 2014. In the beginning of March 2014, Taylor confronted Plaintiff because her former Assistant, Ms. Philitas shared what she had said about him regarding the romantic situations in the office. Taylor confronted her but did not specifically reference the romantic relationship gossip. Plaintiff diplomatically stated that she had a concern that she would have difficulty managing the staff in Bridgeport due to pre-existing personal relationships that may have developed over time. This was a protected activity to complain of a sexually charged work atmosphere. Ms. Philitas also had told Taylor that Plaintiff was critical of him. Taylor told Plaintiff that he was concerned that she may be a "bad apple."

20.     In April 2014, the Bridgeport location was not achieving its customer service goals and Taylor accused Plaintiff of "throwing the numbers." Plaintiff explained that she does not know how to "throw numbers" and that she found his comments hostile. Taylor also threatened to place Plaintiff on a PIP (performance improvement plan) and disciplinary action because her store was not in the 1st or 2nd quartile. Many stores were under goal. By definition, half of the stores at T.D. Bank will of course fall into the 3rd and 4th quartile, and, by information and belief, store managers are not typically placed on a PIP for ranking in the "bottom half."

21.     During this conversation, Taylor began falsely accusing Plaintiff of having "body language" that was "disrespectful to him." He was hostile, intimidating and abrasive. Plaintiff was shocked at his behavior and accusations. Plaintiff was trying not to cry because of the way he was speaking to her. Taylor had a glass window in his office and Plaintiff caught her reflection which revealed nothing about her "body language" that would give this impression.

Plaintiff was, in fact, sitting somewhat bent over with her pen in hand, taking notes. Plaintiff was upset and humiliated.

22.     A few days later, Taylor sent Plaintiff an e-mail telling her that if she did not finish the quarter in the 1st or 2nd quartile, that he would place her on a PIP. In the first quarter of 2015 Taylor did place Plaintiff on an undeserved and unwarranted PIP.

23.     After the meeting with Taylor in April 2014, Plaintiff called Cheryl Weagraff, Human Resources Generalist, and asked her for guidance in this situation. Plaintiff complained about the romantic relationships gossip situation with Taylor and complained that she felt Taylor was threatening her and retaliating against her because she was aware of the gossip and improper behavior of Taylor. This was a protected activity to complain about sex discrimination.

24.     Cheryl Weagraff commented that managers at T.D. Bank are supposed to be transparent and truthful and she was not sure that Taylor was either being transparent or truthful. Plaintiff was surprised by her comment. Plaintiff believed that Cheryl Weagraff took notes for her file regarding this call. Nothing was ever communicated to Plaintiff regarding her complaints and Plaintiff never received any information to indicate that Plaintiff's complaint was investigated.

25.     On June 22, 2014, Plaintiff's husband became very ill and she took him to the ER. He was diagnosed with a brain tumor. They did a biopsy that same week and he suffered complications due to the surgery, spent 3 1/2 weeks in the ICU, and then was in Gaylord Hospital for 2 months where the tumor on his brain-stem ultimately took over. He passed away on September 18, 2014.

26.     Plaintiff went out on FMLA leave on July 3, 2014 until her bereavement leave of one week started. Plaintiff returned to work on September 29, 2014. While her husband was gravely ill, her FMLA leave was coming to an end. Plaintiff spoke with the HR generalist, Cheryl

Weagraff, about returning. Plaintiff did not call her supervisor, Taylor, and speak to him directly because she could not speak about the horrible situation without crying, and she did not feel comfortable doing so in front of Taylor.  T.D. Bank gives employees five days of bereavement leave for immediate family members.  Plaintiff's mother in law passed away on September 12, 2014 and her husband passed away six days later on September 18, 2014.  Although she was technically eligible to take a total of 10 days, Plaintiff took only six days.  Plaintiff's mandated FMLA leave ended the day her husband passed away on a Thursday.  Plaintiff spoke with the Aetna representative who manages their FMLA leave and she e-mailed Taylor on September 19, 2014, to let him know about the deaths in her family and when she would return to work.

27.     Plaintiff notified Taylor when her husband passed away and when she would return to work via e-mail.

28.     It was troubling to Plaintiff that she told Taylor that her husband passed away and that he did not take the time to tell their Regional Manager, Mauro DeCarolis, the news. Mr. DeCarolis did not find out until five weeks later when one of Plaintiff's employees told him.

29.     In the end of October 2014, about five weeks after Plaintiff came back to work, Taylor asked Plaintiff to come into his office to speak to him. He told her that when she opened the door in the morning to let him into the bank, that she had "an angry look" on her face and that she needed to work on her "emotional intelligence."  This was obviously false.  Plaintiff was polite and cordial, despite still experiencing exhaustion and grief in the weeks after her husband passed away at that time.

30.     In December 2014, Taylor sent Plaintiff an antagonistic e-mail after the holiday luncheon asking "Is there a particular reason why you missed the holiday luncheon? Every other manager was there."  It was not a mandatory meeting.  Plaintiff was scheduled to go to the luncheon, but

they had changed the time of the luncheon two days earlier and this created a scheduling conflict for Plaintiff. Plaintiff had scheduled her daughter's therapy appointment for 4:00 p.m. after the original luncheon time. Plaintiff did not want to cancel the appointment because it was the week before Christmas, and given her daughter's history of major depression, coupled with the recent passing of her father, it was imperative that she attend this appointment. That morning, Plaintiff had advised manager Mary Ellen Samatulski, who was also the RSVP contact for the luncheon, that Plaintiff could not go and why.

31.     On January 28, 2015, Plaintiff attended a region-wide event in Massachusetts that was hosted by Mauro DeCarolis. The attendees were all assigned to separate tables, and Taylor sat next to Plaintiff. Plaintiff and Taylor has a discussion regarding employees needing to have a trustworthy and comfortable working relationship with their managers in order to effectively discuss employee's personal development plans.

32.     The following morning, Taylor asked Plaintiff to sit with him and they discussed their thoughts about the meeting. Taylor brought up Plaintiff's previous concerns that she felt uncomfortable with his relationships with other employees and how it adversely affects her work environment. It was clear that Taylor was aware that Plaintiff had spoken to the Human Resources Generalist, Cheryl Weagraff, about his concerns about his relationships and his hostility toward Plaintiff after Plaintiff made comments to Ms. Philitas about his management style. Taylor told Plaintiff that he was personally hurt by her comments about his management style, but he did not deny the comments as untruthful.

33.     One week later, on February 5, 2015, Taylor once again stated that he was concerned that Plaintiff was a "bad apple," and reprimanded her for having a "negative attitude." However,

Plaintiff's attitude was not negative and her communication as a leader has always been solid. Plaintiff believed that Taylor was retaliating against her for complaining about him to HR.

34.     On March 20, 2015, Plaintiff was scheduled to attend a regional recognition bowling event that was hosted by her supervisor's boss, Mauro DeCarolis (approximately age 55), where Plaintiff was being celebrated for being a top performer.  Attendance at the event was optional. On the day of the event there was an impending snow storm and Plaintiff did not feel comfortable traveling (because the event was in South Windsor while Plaintiff lives in Trumbull).  Plaintiff worked in her office the day of the bowling event and e-mailed the administrator to advise that she could not attend due to the weather.

35.     On Saturday, March 21, 2015, Taylor called Plaintiff to speak to her about the bowling event.  He was very angry and his tone was very hostile.  He said, "This is the last straw!"  He barked at her and called her "untrustworthy," apparently because she missed an optional recognition/bowling event.  He stated that she should have let him know she was not attending and accused her of "not respecting him" as her supervisor.  Taylor then referenced that Plaintiff did not call him directly when she wanted to return from FMLA leave six months earlier. He also decided to confront her again about her previous complaint regarding his creating a sexually hostile work environment by dating coworkers and specifically asked Plaintiff if she had evidence that he had sex with T.D. Bank employees.  Then he called her "spiteful."  Taylor was retaliating against her for engaging in a continuous protected activity.  He was hostile, and he was harassing Plaintiff.  Plaintiff was scared.  Plaintiff told him that she was not comfortable having this conversation with him and suggested that they sit down with HR.

36.     On March 25, 2015, Plaintiff had a regularly scheduled one-on-one meeting with Taylor. At no time during that meeting did Taylor express concerns about her store or the bowling party.

Plaintiff's store was pacing at over 100% of its sales goal and was on track to meet customer service goals.

37.    Less than a week later, on Monday, March 30, 2015, Taylor placed Plaintiff on a 60 day probationary PIP for allegedly failing to communicate directly to him that she would not be able to attend the bowling event for top performers. Taylor also complained that Plaintiff previously did not communicate to him directly that she would not be able to attend the holiday luncheon (however, Plaintiff had informed the woman responsible for collecting the RSVPs to said luncheon).

38.    When Taylor placed Plaintiff on the PIP it was only six months after Plaintiff's husband, Andy, died. During that time, Taylor <u>never</u> offered Plaintiff information on the Employee Assistance Program or informed her that there were company-offered resources that she could take advantage of. Plaintiff has no doubt that Taylor deliberately concealed this information from her because he intended to be cruel and because he was discriminating against her due to her age. Taylor did not want to offer Plaintiff any support in her job because he was hoping that Plaintiff would quit.

39.    For the fiscal year ending October 31, 2014, Plaintiff was given a satisfactory performance rating and she was ranked in the <u>top quartile</u> for the first quarter which ended January 31, 2015. However, the PIP incorrectly stated that she was not achieving specific goals. This statement was false and also premature inasmuch as Plaintiff still had one month left in the 2nd quarter and a PIP for performance on sales, among other things, would normally be calculated using an entire quarter.

40.    Plaintiff was shocked to have been placed on a PIP. If there truly was a valid concern about Plaintiff's performance, it was bizarre for Taylor not to have raised it during their one-on-

one meeting, which is intended to be a "coaching" session.  By placing Plaintiff on a PIP without first raising the issued in the one-on-one meeting, Taylor did not follow corporate policy and this creates an inference of discriminatory animus.  In fact, Plaintiff was placed on the PIP in clear retaliation for taking FMLA leave, for her association with her disabled and now deceased husband, and for complaining about a sexually hostile work environment.

41.     At that time, T.D. Bank's stated policy was for all employees to be coached prior to being placed on a PIP, however Taylor did not follow this policy with Plaintiff.  In fact, Plaintiff had only had one formal coaching session since joining T.D. Bank, which that was over four years prior.  Upon information and belief, Taylor did not maintain any coaching notes of these meetings, which is also a violation of T.D. Bank's internal policies.

42.     During the PIP conversation, Taylor referenced that Plaintiff spoke to the regional operations officer, Kathleen Eigenrauch, instead of him when she wanted to return from FMLA. Kathleen referred Plaintiff to Cheryl Weagraff in Human Resources. Plaintiff was suffering a horrendous loss of her husband and she felt more comfortable speaking to her because of her emotional state at the time.  Despite this, Taylor verbally accused Plaintiff of "refusing to accept him" as her supervisor.

43.     Plaintiff did not deserve to receive a PIP.  Plaintiff was always a good employee, loyal, ethical, and received satisfactory performance ratings over the years.  Any alleged "communication problems" or "information sharing" cited in her PIP were fabricated and false. In the PIP, Taylor stated 13 to-do items before their next meeting, which was to occur on April 9, 2015.  The PIP was minutely detailed. When Plaintiff asked about the detailed plan in the PIP, Taylor threatened her and made it clear that he did not need to wait the 60 days to terminate her. His tone was hostile and threatening.

44.     Usually a PIP addressing missing targeted goals is given after a quarter ends because all three months are combined and there may be loans and other items that close before quarter end. However, Plaintiff's PIP incorrectly stated that Plaintiff's store was not meeting goals in 2 areas where the goal was achieved (no numbers were stated on the PIP). Plaintiff recognized the mistake because a spreadsheet is sent out weekly showing which of the 17 stores are making specific goals and everyone is achieving some but not all targets. On information and belief, if Taylor had the PIP approved by HR, he did not disclose the truth to them.

45.     Taylor claimed to be unhappy with the fact that Plaintiff's bank was allegedly not making 6 out of 25 goals that quarter (which ended April 30, 2015). However, there were at least 6 T.D. banks in Plaintiff's region of 17 banks that were ranking lower than hers. On information and belief, the managers of those branches were not placed on PIPs and thus Plaintiff was not being treated equally. For example, Plaintiff's store was pacing at 99.8% of the Sales Revenue goal on March 30, 2015, while another store was pacing at 48% of this same goal. Plaintiff signed the PIP when Taylor presented it to her only because she was extremely afraid not signing it would enrage Taylor even further.

46.     Plaintiff filed written comments in rebuttal to the PIP on April 6, 2015. Plaintiff addressed the accusations in the PIP and pointed out and responded to the discrepancies, as described below:

> a.      The PIP stated: "Did not attend or notify direct supervisor that you would not be able to attend the CT Market R = R in Windsor CT."
>
> I notified the person that I was supposed to RSVP to that I would not be able to attend. This event was not hosted by my supervisor. He was an attendee. – I also made the decision at 6:30 am to not attend due to weather and was concerned about letting the person know that I was meeting. I was not instructed to notify Taylor. This does not warrant a probationary PIP.

b.      The PIP stated: "As previously reviewed when you were unable to attend the Holiday Luncheon and did not inform myself, we discussed proper protocol and professional practice to notify your direct supervisor if you are unable to attend a company event."

I responded to the RSVP person the day of the event.  We were in a meeting that morning and I did not believe that it was necessary to also notify Taylor.

c.      The PIP stated: "You have not responded to my coaching and feedback regarding steps you must take to improve your communication and leadership skills.  Even after numerous conversations for the past two years, including 3/21/2015, 3/4/2015, 2/9/2015, where I have met with you to address your negative, disrespectful, and unprofessional comments toward both your direct supervisor and the regional practices your behavior has not corrected which directly impacts your leadership effectiveness."

On 3/21/2015, Taylor called me to reprimand me for not e-mailing him that I could not go to the regional recognition event. He then brought up a discussion from March of 2014 [about his affairs and how he has created a sexually charged work environment].  On 2/9/2014, he told me in passing that a few managers told him I have a negative attitude.   On 3/4/2015 I do not see a meeting scheduled with Taylor and do not recall having any discussion with him.   One day I was sitting in my office on a conference call with two other managers sitting with me and while the phone was on mute, made a comment about having trouble getting out to do the business calls or something to that effect. Taylor feels that I am not supporting him and his strategies if I complain to one of my peers.

d.      The PIP stated, "You are not demonstrating the leadership skills necessary to motivate your team to perform at a level necessary for your store to be successful."

"On several occasions I have met with you to discuss your lack of follow through on completing tasks, providing requested information and gaps in your leadership. Most recently we met on 1/15/15 we met to discuss leadership opportunities and I provided several examples of tasks, activities, and deadlines that were not accomplished due to improper time management."
When Taylor did my year-end review in November of 2014, he mentioned that I was late with the PDP's in May of 2014 and in November of 2014 I did not decorate my bulletin board in my lunchroom in a timely manner for the ROAR campaign.

Taylor also reduced my headcount to an FTE [full time employees] of 6 while I had a FTE employee out on workman's compensation for over three months and we were experiencing the holiday vacation time, so I worked with an FTE of 4 for three months and was criticized for not being able to make business development calls and make 10 business appointments every week.  It is impossible to complete these tasks with such a limited FTE and, in addition, my time was

extremely stressed because I am constantly being utilized as a customer service representative due to the volume and short staffing in our store. I spend about 50-75% of my time in either customer facing or operational tasks that would be handled by other employees if they were here. I am not able to do the work of two people. I also do not think that missing on[e] deadline (if I even did which I do not recall) in May of 2014 and not decorating the lunchroom in a timely manner are enough to show a true lack of leadership.

e.     The PIP stated: "Your leadership has resulted in inconsistent performance of your store. Which is evidenced in RADAR, WSI, Small Business, Sales Revenue, Wealth, and LEI."

No numbers were stated on this PIP to back up the assertion that I was not achieving these goals.

All of the goals mentioned feed into supporting the one main goal: Sales Revenue. A store may be exceeding one goal and be behind in another. We receive a weekly performance scorecard and every store in our region of 17 stores is behind in 4-10 of these goals. Our quarterly WIN report is how the stores are rated and ranked. The customer service scores (LEI), the Sales Revenue, the business checking, personal checking, and Wealth all are categories used to determine our ranking and success.

We finished the 2nd quarter ending April 30, 2015 at 103% of our SR goal, at 146.7% of our small business checking goal, and at 96.5% of our personal checking goal.

We finished the first quarter in the 1st quartile and at the time of the PIP were pacing at 99.8% of our SR goal and were slightly below goal on customer service. The 2nd quarter ended 4/30/15. The PIP was administered 3/30/15. Taylor did not state any numbers on the PIP, but his follow up e-mail to me confirms our standing of that date. He typically uses ALL numbers in performance reviews, etc.

At the end of the fiscal year 2014, I was rated "Quality Solid." Then was in the 1st Quartile that ended 1/30/2015. At the time the PIP was administered, we were only slightly under goal and had another month to finish the quarter. – If this was truly about my "inconsistent" performance, why would Taylor wait until I had demonstrated five months of positive performance to present the PIP?

f.     The PIP stated: "As the leader of your store, it is imperative that you develop a strong working relationships with your staff and me to gain our trust and confidence. Your team needs to view you as a leader, who clearly communicates the plan for success and expectations, ensures the plan is executed, supports the team in accomplishing their goals, monitors performance, and provides coaching and feedback. Taking these steps will help you to gain the respect of your team as a leader and enable you to gain their support and commitment."

There is nothing specific here stating that I am doing something wrong or incorrectly.  There are no examples.  I have the support and commitment of my staff.  I have a strong working relationship with my staff.  I have gained their trust and confidence. They do view me as a leader. This statement is insinuating that they do not. – But, obviously I have not gained Taylor's trust because he called me "untrustworthy" when I did not tell him that I was unable to go the recognition event.

47.    In the PIP, Plaintiff is being treated differently than similarly situated employees. Plaintiff is being held accountable for actions related to the "Strategic Plan" (SP) that other managers are not.  The SP was developed for the new fiscal year beginning November 1, 2014. This SP is for Plaintiff's region and as part of the SP, Taylor should be checking to see if Plaintiff has coaching notes, memos showing that we did daily huddles, etc.  He has never followed up with Plaintiff, nor asked for a status regarding the SP.  In the PIP, Plaintiff is now being held accountable to the SP, but not all managers have been treated similarly.  Plaintiff specifically asked Taylor if all managers were accountable to the SP and he said it would not be appropriate for him to discuss that with her. Coincidentally (and subsequently to her asking Taylor about all managers being accountable for the SP), in late May 2015, Robert Van Zandt, as administrative assistant, resent the SP out to <u>all</u> of the managers to encourage them to follow the SP.  This was done per Taylor's request.  On information and belief, if all managers were required to follow the SP, they would already have a copy of it and not have to receive another copy some six months after it was first released.

48.    In the PIP, Plaintiff was ordered to greet for 10 hours a week (which is not in the SP). Plaintiff told Taylor that she would take 15 minutes every hour to greet.  After Plaintiff received her PIP and after greeting sessions were required of her, Taylor then started asking all the managers to greet customers.  Plaintiff was held to a different standard.

49.     In the PIP, Plaintiff was ordered to complete online training on "Emotional Intelligence" with a deadline of April 15, 2015. When Plaintiff went into the system, there were 9 different online classes. Plaintiff e-mailed Taylor on March 30, 2015 asking which of the classes he wanted her to complete. Taylor ignored her e-mail, so she re-sent it 4 days later on April 2, 2015. Taylor responded to complete all of them. The online classes took about 5 hours to complete. There were many redundancies in the content and information. In order to complete the 5 hours of EI training, Plaintiff had to go in on a Sunday just to complete this online training. Taylor, in requiring Plaintiff to complete all 9 online courses, created a nearly impossible situation where Plaintiff had a very short time frame to do extensive online training in order to comply with the PIP or face "further disciplinary action." It was very difficult for Plaintiff to complete the training because of other work demands and frequent interruptions.

50.     Plaintiff also spoke to Teresa Dutton in HR on April 2, 2015 regarding the PIP. Plaintiff specifically stated that she felt Taylor and she needed a mediator to help them work through these issues. She recommended that Plaintiff send an e-mail asking for an HR representative to meet with them. Plaintiff did so and put this request in writing in an e-mail to HR on April 6, 2015, but there was never a follow-up meeting.

51.     Theresa Dixon, the HR generalist who is listed as the contact on the PIP did call Plaintiff on the phone on April 8, 2015. Theresa Dixon assured Plaintiff that she had spoken to Taylor and that their two-hour bi-weekly progress meetings would help them to communicate together effectively. She asked Plaintiff if she was intimidated by Taylor and Plaintiff found this question odd, even though she was, in fact, very intimidated by Taylor. No one at HR followed up on Plaintiff's meeting request, despite Plaintiff's attempts to contact T.D. Bank Ombudsman's

office. It was very clear to Plaintiff that T.D. Bank's policies are only designed to aid the company, not the employee.

52.     On Thursday, April 9, 2015 (9 days later) Taylor and Plaintiff had a meeting to review her two-week progress on the PIP but no mediator was present. Taylor asked his administrative assistant, Robert Van Zandt (age 26), to sit in on the meeting. Plaintiff felt embarrassed and humiliated that a more junior employee who she sees on a daily basis was asked to be a witness to their conversation. The meeting was very tense. Taylor began the meeting by telling Plaintiff that retail banking "has changed a lot in the 35 years." Taylor was clearly implying that Plaintiff was too old to keep up.

53.     Taylor then claimed that Plaintiff's "numbers had slipped" and stated that if "this continued", he would have to take "further disciplinary action." His tone was hostile. Mr. Van Zandt witnesses this embarrassing dressing-down of Plaintiff. Taylor then went through the 13 items on the PIP very slowly and thoroughly. At the end, when Plaintiff stood up to leave the meeting, Taylor suddenly volunteered that HR had approved the usage of his administrative assistant, Robert Van Zandt, as a witness to their conversation. HR never informed Plaintiff that Mr. Van Zandt was an approved witness. In the fall of 2017, Robert Van Zandt was transferred into a Customer Service Representative Role in Trumbull, which is still 3 grade levels below a store manager. At no time was he a member of the leadership / management team at T.D. Bank and it made absolutely no sense why Taylor would have allowed him to be used as a "witness" during the PIP follow up meetings, other than simply to maximize Plaintiff's potential embarrassment.

54.     Plaintiff was then required to meet with Taylor for two hours every two weeks to review the progress on the PIP.

55.     On April 22, 2015, Taylor sent an e-mail to Plaintiff confirming the progress meeting

notes.  In that email Taylor, once again, referenced how "things have changed" in the 35 years

since Plaintiff has been in banking industry and that the role and demands of a bank manager in

2015 are different than when she started in the industry.  This statement was discriminatory

based on Plaintiff's age and obviously implied that Plaintiff was too old to properly perform her

job.  Plaintiff was treated differently because of her age and was treated differently than similarly

situated younger employees.

56.     In early May 2015, as Plaintiff was walking past Ray and Mary Ellen, she overheard Ray

telling Mary Ellen that he just received some type of legal complaint from an employee who he

terminated two years ago.  His conversation was unprofessional and indiscreet. Ray and Mary

Ellen were talking about going to court or an unemployment hearing, and in front of Plaintiff he

looked at Mary Ellen and said, "Mary Ellen would just pull a boob out!" Plaintiff was shocked

and walked away.  This was direct evidence of co-workers creating a sexually charged work

environment.

57.     In early May 2015, after Plaintiff received the PIP, Mary Ellen asked Plaintiff if she

wanted to eat lunch with her and Plaintiff agreed.  Plaintiff's impression was that she was trying

to bait her and see if she would say anything that she could report back to Taylor.

58.     On May 8, 2015, Plaintiff met with Taylor for a Progress Report related to her PIP.  One

of the PIP expectations asked for "proof" of Personal Development Plan ("PDP") conversations

with the employees.  Once the manager has had the discussion with the employee, the employees

are instructed to enter "yes" online into the PDP program to indicate that the conversation has

been completed.  Plaintiff completed the conversations, e-mailed Taylor confirming this, and

asked the employees to submit "yes."  At the PIP progress meeting on May 8, 2015 Taylor stated

that Plaintiff was also supposed to send him a written synopsis of the discussions that she had

with all five of the employees as proof, although this was not specified in the PIP. The PDP

system was very awkward for employees to use and Taylor himself had difficulty getting all the

store managers to complete their conversation confirmations in a timely manner. Nonetheless, in

March 2015, he documented on Plaintiff's PIP progress report that she did not complete this task

as requested. This is yet another example of Plaintiff being held to different, higher standards

than other similarly situated employees.

59.     The PIP also requires Plaintiff to spend time each week coaching the Head Teller for

RADAR and Credit Cards. Since Plaintiff's Head Teller left the bank in the end of April, at the

progress meeting of May 8, 2015, Taylor added that Plaintiff was required to coach all three of

the tellers weekly in RADAR and credit cards. At that point, Taylor was continuously adding

requests to the PIP and giving Plaintiff more tasks to do. It was clear that Taylor was setting

Plaintiff up to fail. These actions are further evidence of the discrimination and retaliation

against Plaintiff.

60.     In another example, Plaintiff inadvertently sent one wrong page (regarding an audit) in a

document to Taylor on April 30, 2015. Instead of simply asking Plaintiff for the correct page,

Taylor documented on the May 8, 2015 PIP follow up that Plaintiff sent the wrong page. That

same week, they had an internal audit and Plaintiff received a score of 94% Satisfactory. It

continued to be clear that Taylor was using the PIP to discriminate and retaliate against Plaintiff,

and in no way was the PIP being used to help Plaintiff to improve her performance.

61.     The discrimination, retaliation, bullying and harassment continued. On May 8, 2015,

Taylor criticized Plaintiff's coaching of the tellers claiming that she did not use the SMART

principals (a T.D. Bank policy which states that supervisors should provide employees with

goals that are attainable, realistic, and timely). This was baseless. Plaintiff gave her tellers specific goals that were attainable, realistic, and timely. Taylor stated on the PIP follow up that Plaintiff's coaching was "not per standard" without giving specifics.

62. However, in Plaintiff's own PIP, Taylor completely failed to give Plaintiff SMART goals, including by failing to state what success would look like for her. He intentionally deviated from company policy, evidencing an inference of discriminatory and retaliatory bias.

63. The stated reasons for Plaintiff's PIP was because Plaintiff did not attend a bowling recognition event over an hour away in a snowstorm – <u>during which event Plaintiff herself was supposed to be celebrated as a top performer</u>. This "reason" is preposterous and very obviously false and pretextual.

64. The falsity of this "reason" was also betrayed by Taylor's own statements to Plaintiff, where he verbally told her that he was in fact upset with her for not telling him when she would return from FMLA leave after her husband passed away. Plaintiff had, in fact, advised the regional operations officer, Kathleen Eigenrauch, about her return, which was perfectly appropriate. Taylor had absolutely no rational basis or authority to object. It was obvious that the source of Taylor's irritation was simply a bruised ego because Plaintiff elected to communicate her return to a Kathleen Eigenrauch (which was perfectly appropriate). Taylor was punishing Plaintiff for taking FMLA leave and because he wanted to control her.

65. Thus, the real reason Plaintiff was placed on the PIP was unlawful animus toward her for having taken leave under the FMLA. In addition, T.D. Bank and Plaintiff's supervisor, Taylor, discriminated against Plaintiff because of her age, her association with her disabled daughter, and her now deceased disabled husband. The company retaliated against her for registering a complaint that her supervisor created a sexually hostile work environment by dating coworkers.

66. On December 23, 2015, Taylor called Plaintiff and told her about a position that was going to be posted at TD Bank for a Merchant Services Account Executive. This person would report to a manager in New Hampshire and cover a territory in Connecticut. Taylor asked Plaintiff to think about whether this is something she would be interested in and he wanted her to call him to discuss it the Monday after the holiday. The position was the same grade as the one Plaintiff was in. Taylor encouraged Plaintiff to speak to the hiring manager during the week of December 28th, which Plaintiff did.

67. On Tuesday, February 2, 2016, Plaintiff met with the hiring manager, Daniel Brown, and he described the position in detail to Plaintiff. Taylor knew that Plaintiff was going to be meeting with him and he e-mailed Plaintiff an hour after her meeting asking her how it went. In speaking with the hiring manager, Plaintiff learned that this position was a salary plus commission role and that the range for the base salary is between $50-$70K per year with the ability to make commissions on sales.

68. At that time, Plaintiff's salary was $86,500, so this role would be tantamount to a demotion.

69. Plaintiff answered Taylor's e-mail and let him know what Daniel Brown and she had discussed and told him that she would need to think about the position, particularly because of the lower salary. Taylor e-mailed Plaintiff very early the following morning, stating that he wanted to discuss the position with her at 10:00 a.m. Plaintiff was on the telephone with Taylor for more than a half hour and she felt like he was trying very hard to pressure her to pursue the position and was trying to challenge the objections that she had to the role. In that Plaintiff considered this role to be a step down, she did not pursue the position further.

70.     At the time, Plaintiff believed that the role was not right for her and she felt very uncomfortable that Taylor was trying to push her into the lower-salaried role, even though he was claiming that it was her decision.  Taylor also said that if she accepted the role and it turned out not to be right for her, then she could come back into the retail bank, but Plaintiff feared that she would be re-hired at a lower salary.

71.     Plaintiff was not being asked to take the new role due to any performance deficiencies. Plaintiff was rated satisfactory for the year and had a very good year performance-wise in 2015.

72.     In the fall of 2016, Taylor required Plaintiff to spend three days with a manager from another T.D. Bank branch location, Ray Cirisoli, supposedly so that she could learn how to do her job, even though she had been employed with T.D. Bank for over seven years at that point. Ray Cirisoli told Plaintiff that, although "we were close in age" he felt that he had "caught on" to the "changes" faster than she had.  Plaintiff immediately knew the meeting was yet more discrimination against her on the basis of her age and intended to make her feel humiliated.

73.     Plaintiff was transferred to the Greens Farms T.D. Bank branch in April 2016, which is a very quiet branch.  It was extremely difficult to meet sales goals at the Greens Farms location, and indeed Plaintiff was aware that branch had struggled over the years.

74.     Upon information and belief, the previous manager in Greens Farms, Jahmeca Miller, threatened to resign because she wanted to work closer to home, so Taylor switched them, transferring Plaintiff from Bridgeport to Greens Farms and Jahmeca to Bridgeport.  Jahmeca is younger than Plaintiff.

75.     While Plaintiff had been managing the Bridgeport branch, Taylor repeatedly reduced her full-time employee (FTE) headcount but, when Jahmeca took over for her as the Bridgeport manager, Taylor increased Jahmeca's FTE almost immediately.

76.     The Assistant Manager in Greens Farms, Zade Nallbani had a history of having a very abrasive personality.  This reputation preceded Plaintiff's transfer to Greens Farms.  However, Plaintiff had observed that Taylor favored and protected Zade.

77.     While working in Greens Farms, Plaintiff had to coach Zade on multiple occasions, including regarding her interactions with customers and employees.  Numerous customers and employees complained to Plaintiff about Zade's demeanor, rudeness, and bullying.  On one occasion, an internal applicant whom Zade interviewed called HR and complained about her after the interview.  Zade's demeanor towards Plaintiff was likewise undermining and insubordinate and hostile.

78.     During the week of March 21, 2017, Plaintiff attempted to have a coaching conversation with Zade because of an incident where Zade told Plaintiff she could not schedule her vacation because she felt Plaintiff would have too many weekends off.  Zade loudly stated this across the lobby to Plaintiff in front of a teller.  Plaintiff told Zade that Taylor, their supervisor, had already approved her vacation and that Zade could schedule herself and Liz Ortiz and Lee Halpern to work the Saturdays and Sundays when Plaintiff would be away, just as they had previously done when Zade had been out.  Zade left shortly after this contentious conversation and slammed the door behind her in anger.  Plaintiff felt she was trying to intimidate and frighten her.

79.     The next day Zade sent a memo to Plaintiff, telling her that she thought she had been disrespectful to her.  Plaintiff felt Zade knew her own hostile behavior was highly inappropriate and was trying to protect herself and establish her defense.  Plaintiff told Taylor that she planned to have a coaching conversation with Zade to address Zade's rude and insubordinate behavior and Taylor requested to sit in on the meeting.  During that conversation, Zade became very

defensive and angry when Plaintiff spoke to her about her behavior. Even in the meeting, she continued to be hostile and disrespectful toward Plaintiff.

80.     During that meeting, Zade made several obviously false accusations about Plaintiff, including that Plaintiff supposedly forgot to lock a vault four months prior, and that one day Plaintiff interrupted an employee "huddle" to start a conversation about cats and dogs. Zade also falsely told Taylor that a CSR had quit because of Plaintiff. Zade was clearly trying to fabricate claims against Plaintiff to Taylor and suggest that the employees did not like Plaintiff.

81.     During this conversation, Taylor did not make any effort to moderate or mediate. Zade's claims were very obviously untrue, and yet Taylor told Plaintiff that he would have to do an onsite "climate survey" of Plaintiff's branch and employees.

82.     Following this conversation, Taylor told Plaintiff that he thought Plaintiff "put the bank at risk." This was a bizarre statement. Plaintiff had simply addressed her employee's inappropriate behavior pursuant to T.D. Bank policies, and provided specific examples of incidents where Zade, Plaintiff's subordinate, had been intentionally disrespectful to Plaintiff. The examples Plaintiff provided included one occasion where Zade loudly accused Plaintiff of making mistakes and questioned her judgment in front of other employees. On another occasion, Zade questioned Plaintiff's management decision to give a customer a $15 courtesy credit in front of a teller. On yet another occasion, Zade questioned Plaintiff's judgment in front of an employee who was filling in from another store.

83.     After their meeting, Taylor told Plaintiff that she was not doing her job "properly" and told Plaintiff that, even if Plaintiff was meeting her goals, that Plaintiff "should not get a false sense of security." This was an obvious threat. However, at the same time, Plaintiff was in the

top quartile for the period ending January 31, 2017. In addition, she received a satisfactory rating for the period ending November 30, 2016, and received a raise in January 2017.

84. A fellow employee, Jayshylia Valentine, came to Plaintiff and expressed to her that she was not comfortable with "the situation" going on in their branch, referring to the open hostility Zade was exhibiting toward Plaintiff. Jayshylia Valentine told Plaintiff that Zade gossiped about Plaintiff constantly to the staff and that Zade instructed two other employees to "watch" Plaintiff and report to her if they see Plaintiff make any mistakes. A different employee, Volkan Gaziayvazoglu, reported to Plaintiff that Zade hovered over employees to attempt to manipulate how they responded in the annual employee survey. Plaintiff reported this unethical tactic to HR, but Zade denied it and HR said they could do nothing further.

85. In addition, Plaintiff had two very good employees resign, Lee Halpern and Volkan Gaziayvazoglu, due to the hostility created by Zade. Volkan Gaziayvazoglu told Plaintiff that he had spoken to HR to complain about Zade's behavior prior to resigning. For example, Zade had reprimanded James Rizzi and Volkan Gaziayvazoglu for laughing even though there were no customers in the bank and they weren't being unprofessional or causing a disturbance. Zade would also stand behind employees, obviously intending to be intimidating, and stomp around and slam doors. Volkan Gaziayvazoglu told Plaintiff he was uncomfortable because Zade was polarizing the staff and trying to get employees to take her side against Plaintiff, without reason. Because Zade was so spiteful, employees were afraid to disagree with her.

86. Plaintiff informed HR of the ongoing issues and HR advised Plaintiff to continue coaching Zade and to memorialize the conversations in email recaps which Plaintiff would then send to Zade and HR after each coaching session. HR also told Plaintiff that if Zade's behavior

did not improve, then Plaintiff could place Zade on a PIP. However, Plaintiff was hesitant to escalate the issue with Zade because she was fearful of further retaliation.

87.     In February 2017, Zade was out for four weeks because her father was ill. At the same time, the head teller was out on disability, another part time teller was on an emergency leave of absence. Because of this, Plaintiff's store was extremely short-staffed and, forcing Plaintiff to assist with the CSR role in addition to her regular duties.

88.     Despite all of this, Taylor told Plaintiff that she had a "problem with time management and accused her of being an "individual performer" because she was waiting on customers. At that point, Taylor had instructed Plaintiff to stand in the lobby for 20 hours a week greeting customers, make outbound cold calls for seven hours a week, and spend the remainder of the time having one-on-one coaching sessions with the few remaining employees in the office. However, the reality was that Plaintiff's store was operating with four people most days, making Taylor's demands virtually impossible for Plaintiff to meet. Still, Taylor accused Plaintiff of "deliberately" failing to meet his demands, while ignoring Plaintiff's impossible short-staffed position. By all indications, Taylor was trying to force Plaintiff to quit.

89.     At that point, Taylor required Plaintiff to have coaching meetings with him every other week for three months and told her that he assigned another manager, Michelle Smith – who is at the same seniority level as Plaintiff – to be her "mentor." Plaintiff later discovered that Taylor did not tell Michelle Smith that she was Plaintiff's "mentor," but only that Plaintiff might need to call her with questions from time to time. Plaintiff believes he used the word "mentor" in order to embarrass, bully, demean and humiliate Plaintiff.

90.     During coaching meetings with Taylor, he repeatedly mentioned Plaintiff's "35 years' experience" and told her that he thought she did not have "the will" to do her job. This was more obvious age discrimination.

91.     Plaintiff repeatedly attempted to explain to Taylor that the short staffing situation made it physically impossible for Plaintiff to meet Taylor's demands, bur Taylor responded, "all I am hearing are excuses" and continued to accuse Plaintiff of failing to do her job properly. Taylor was deliberately setting Plaintiff up to fail. On information and belief, Taylor never made similar accusations to her much younger assistant manager, Zade.

92.     Taylor continued displaying favoritism for Zade, who was Plaintiff's subordinate and younger than Plaintiff. For example, when Plaintiff was transferred to the Greens Farms location (where Zade was the assistant manager), Taylor told Plaintiff that she was required to sit at the front desk, which is usually where a CSR would sit, while Zade sat at a desk behind Plaintiff, which is typically where a supervisor would sit. At other T.D. Bank locations, the manager always sits at a back desk. This is important because, as the manager, Plaintiff is supposed to conduct observations of the employee's sales interactions and oversee Zade, but it is much harder for Plaintiff to do this from a front desk. Taylor claimed that he wanted Plaintiff to sit at the front desk to "see customers in the lobby," but the actual result is that Plaintiff end up being constantly interrupted to help customers, instead of managing, and then Plaintiff gets accused of not doing her job properly. Taylor did not require other managers to sit at a front desk. Plaintiff complied because she was afraid of further retaliation from Taylor and because Taylor openly admitted that he regularly watched the security camera footage.

93.     Since Taylor became Plaintiff's Regional Market Manager, Zade's daughter, son, and niece were all hired by T.D. Bank.  This is a clear indication of favoritism and nepotism between Taylor and Zade

94.     Taylor also bullied Plaintiff and treated her differently from other managers.  For example, Taylor reprimanded Plaintiff for assisting tellers (due to the short staffing), claiming that it was "not Plaintiff's job." However, when at the Bridgeport branch, Plaintiff repeatedly saw the manager there, Jahmeca Miller, doing the exact same thing.  <u>Taylor is well aware of this as his office is in the Bridgeport branch, but it was apparent that he had not reprimanded Jahmeca for assisting tellers, as he had done to Plaintiff</u>.

95.     Another example of Taylor's unequal bullying involved cell phone usage.  During monthly manager meetings with Taylor, most managers had personal cell phones out and occasionally used them.  Plaintiff observed other managers checking work email and personal text messages during these meetings.  However, on multiple occasions, Taylor would chastise Plaintiff if she ever glanced at her device to check work email.  Plaintiff was the only one Taylor reprimanded in this manner.

96.     On Sunday, April 2, 2017, Plaintiff sent an e-mail to Dawn Miller in Human Resources, to inform her that she believed Taylor was harassing and discriminating against her because of her age.  Plaintiff copied Taylor's boss, Mauro DeCarolis on that email.  In that email, Plaintiff also informed Dawn that when Taylor repeatedly transferred Plaintiff to smaller and quieter offices, he replaced her with much younger managers at her prior positions.  Plaintiff pointed out that when she was transferred to Bridgeport, the FTE (full time employee) headcount at that location was immediately <u>reduced</u>, but when the prior Greens Farms manager, Jahmeca Miller (who is younger than Plaintiff), was transferred to Plaintiff's prior position in Bridgeport, Taylor

increased her employee headcount right away.  When the branch is fully staffed, it makes it much easier for a manager to focus on managerial duties.  Lastly, Plaintiff also always noted in the email that she had always been rated satisfactory in the 7 1/2 years that she was at T.D. Bank.

97.     On April 17, 2017, all employees were required to sign off that they understood the bank's policy to <u>always</u> obtain a customer's signature when opening an account or making a change to an account (this was most likely in response to multiple scandals where banks were accused of fraudulently altering customer's accounts in order to pump up sales revenue numbers).

98.     On April 24, 2017, Zade opened a business account without the customer present, without obtaining signatures, issued a debit card with a pin number and a set up online banking access.  <u>This was a huge procedural violation</u>.  Plaintiff reported the violation to HR and HR instructed Plaintiff to speak to Zade.  Plaintiff spoke to Zade about the procedural violation and Plaintiff sent a recap of their conversation to HR.  Typically, the next step in such an incident would be for HR to make a recommendation to Plaintiff about how to handle the situation, which Plaintiff would then inform Taylor of and carry out.

99.     However, instead of this typical process, the Operations Manager, China Ross, who Plaintiff knew to be personally close with both Taylor and Zade, scheduled a one hour conference call with Zade and Plaintiff to discuss Zade's infraction.  Incredibly, Plaintiff later learned that Zade complained to China Ross that Plaintiff had addressed Zade's procedural violation with Zade (as Plaintiff had been instructed by HR to do).  Directly contrary to T.D. Bank's clear and new policy, and to Plaintiff's shock, China Ross appeared to side with Zade and told Plaintiff that she felt there was no risk to the bank.

100.    At that point, it was obvious to Plaintiff that Zade, Taylor, and China Ross were ganging up together against her.  Zade had <u>blatantly</u> violated bank policy and yet China Ross was implying to Plaintiff that Plaintiff should not have reported it to HR.  China Ross was also one of the individuals rumored to be romantically involved with Taylor.

101.    On Friday, April 28, 2017, Theresa Dixon in HR informed Plaintiff that T.D. Bank did not have <u>anything</u> in her file since she was placed on the PIP in 2015.  This means that <u>Taylor was not informing HR of any of the multiple conversations and memos that he had with Plaintiff about Plaintiff's supposed "performance issues."</u>  If there was truly an issue with Plaintiff's performance, Taylor should have been reporting it to HR.

102.    Thus, it is indisputable that Taylor and Zade were deliberately targeting Plaintiff in retaliation for making complaints to HR and because of Plaintiff's age.

103.    On May 2, 2017, Taylor sent Plaintiff an email at the end of the day asking Plaintiff if she had gotten all her managerial tasks done for the day, such as coaching and doing observations, when he was aware that her branch had only three employees all day long.  It was impossible for Plaintiff to complete her managerial duties when the store was so short staffed, and Plaintiff repeatedly told Taylor this.  With so little staff, Plaintiff was forced to scramble from 8:30 a.m. until 6 p.m. helping customers, answering the phone, running to the vault, etc.

104.    In addition, on that particular day (May 2, 2017) Plaintiff had to correct a mistake that Zade made on a necessary daily spreadsheet before Zade left for the day.  Again, Taylor routinely accused Plaintiff of doing her job improperly, but he did not criticize the much younger assistant manager Zade for her errors and mistakes.

105.    On May 6, 2017, Plaintiff received an e-mail that went to <u>all</u> the managers from Taylor, requiring that everyone make an hour of sales calls per day. However, back in March 2017,

Taylor sent Plaintiff an individual email claiming that her performance was deficient because she was not making enough cold calls. It appears that because Plaintiff made complaints with HR, Taylor was trying to protect himself by creating the same expectations for all managers that he had been imposing solely on Plaintiff for months.

106.    Despite all of this, Plaintiff was in the top quartile for the period ending January 31, 2017, received a satisfactory rating for the period ending November 30, 2016, and received a raise January 1, 2017. Taylor's constant accusations that Plaintiff was a poor performer or that she was failing to do her job properly are completely baseless.

107.    Taylor was trying to harass, intimidate, bully, and humiliate Plaintiff because he was retaliating against her for making complaints to HR and discriminating against Plaintiff because of her age. He was trying to set Plaintiff up to fail or to quit. <u>The fact that Taylor failed to even once report any of Plaintiff's so-called performance issues to HR since putting her on a PIP is clear evidence that he was fully aware that his claims are without merit or truth and unfounded</u>.

108.    Zade was promoted and transferred to a different location in June 2017 and Plaintiff's head teller went out on an extended maternity leave on July 21, 2017, so Plaintiff worked with a full time employment count of 4.0 vs. 6.5 for over four months. Plaintiff was forced to rely on e-mailing Taylor's administrative assistant to ask for help on the teller line.

109.    On July 2, 2017, the Greens Farms store was robbed. Both Taylor and Plaintiff went to the store to communicate with the staff and the Westport police. It is T.D. Bank's policy to have a Regional Operations Officer come to the store to offer support the day after a robbery. HR confirmed with Plaintiff that this was the correct policy. However, after the robbery, China Ross, the Regional Operations officer, told Plaintiff that she would not visit the store and would instead simply have a representative from the Employee Assistance Program ("EAP") visit. On

information and belief, Plaintiff was not offered the same support as other stores who were the victims of robberies because she was being discriminated against and retaliated against.

110.    In late July 2017, on a Saturday, teller James Rizzi and Plaintiff were the only two employees working.  Plaintiff sent numerous e-mails requesting help in the preceding weeks but was denied assistance because Taylor did not want the other stores to have overtime.  This caused Plaintiff to not be able to comply with TD Bank's policy of granting employees a lunch break after five and half hours of work.  This also caused Plaintiff's store to lose points on an audit due to not complying with this policy.  Plaintiff's store also lost points because not all the employees were able to complete their compliance training on time.  Plaintiff's full time employee count should have been 6.5.  On information and belief, Taylor was withholding resources in order to set Plaintiff up for failure.

111.    Plaintiff was well liked by her employees (other than Zade).  Five employees who formerly worked for Plaintiff over the past years at T.D. Bank applied for open positions at her branch.

112.    On information and belief, Taylor discriminated against multiple employees due to their age.  For example, Taylor intentionally orchestrated the transfer of John Rodas, an older supervisor, in June of 2017 from Fairfield to Greens Farms so that he could lay him off when that branch closed.  John Rodas was excellent with the customers and employees, operationally strong, and a very hard worker with a perpetually pleasant personality and demeanor.

113.    Taylor continued to hire young store managers with no banking experience.  Two examples are Shalene Venetis (approximately 31 years old) and Tara Hartigan (approximately 37 years old).  Shalene Venetis had been a mortgage broker and Tara Hartigan had been a manager at Bath and Body Works.  Neither worked in retail banking prior to Taylor hiring them as

managers.  In August 2017 Taylor promoted 27 year old Drita Gjonbalaj to be a manager of the Darien location. Drita Gjonbalaj is Zade's niece.

114.    Plaintiff was blatantly not treated as favorably as the younger employees.  When Plaintiff was notified that her position was being eliminated, she was encouraged to apply for lateral positions at TD Bank, but Taylor immediately promoted a 27 year old assistant manager into his only open manager position.  Taylor was clearly trying to thwart Plaintiff and he was discriminating against Plaintiff because of her age.

115.    When the stores were consolidated, Taylor chose Tara Hartigan, the much younger former Bath and Body works manager who was significantly less experienced than Plaintiff to remain. Upon information and belief, Tara struggles with her lack of experience and constantly relies on the Assistant Store Manager and Store Supervisor.  Taylor claimed that the reason Tara Hartigan was selected was because of her performance reviews and "skill set."  However, at the time, Tara would not yet have had a performance appraisal and her store (Westport) was not performing well.  It is clear that Taylor used the Westport store closing as an opportunity to finally be able to get rid of Plaintiff, without legitimate cause or reason.

116.    When Taylor met with Plaintiff on September 20th, 2017 to tell her that she was not the manager selected, he did not tell her that she could apply to other positions in the bank. When she received the official letter from Human Resources, she was encouraged to apply for other positions. It was clear that Taylor wanted to get rid of Plaintiff.  After she was notified of her position being eliminated, two ASM positions became available, but were immediately filled by Taylor.   This was a breach of T.D. Bank's policy of posting jobs for five days internally, and on information and belief was done deliberately to thwart Plaintiff from applying to those positions.

117.    Due to the short staffing, before she was terminated, Plaintiff was forced to spend most of her time on non-managerial tasks such as servicing accounts, opening accounts, doing audits, counting cash, and even running a teller window.  Plaintiff continuously requested adequate staffing and was ignored.  Instead, Taylor often forced Plaintiff to work six days a week, frequently more than 50 hours a week.  At one point, from the end of May until the middle of June, Plaintiff had two days off in a period of 19 days. This included Memorial Day when the bank was closed. Because T.D. Bank is open Sundays, Plaintiff also had other times where she worked 10 or 11 days without a break.

118.    Pursuant to T.D. Bank policy, Plaintiff was a classified as an "exempt employee" who was not entitled to overtime pay.  However, Plaintiff had been doing the tasks of a lower-level non-exempt employee.  In a T.D. Bank store, any employee below the level of manager is considered to be a non-exempt employee.  The vast majority of Plaintiff's time was spent doing non-managerial-type tasks such as greeting customers, opening and closing accounts, handling customer phone calls, answering customer questions, counting money, and other clerical tasks.

119.    On Monday, August 21, 2017, Taylor notified employees from both stores of the consolidation.  This meeting ended at about 7:30 p.m.

120.    On November 7, 2017 Plaintiff received poster sized boxes at her store that were addressed to Tara Hartigan, the manager of a different store.

121.    On November 8, 2017, Tara Hartigan came to Plaintiff's store, opened the posters, set up an easel, and did a Meet and Greet for two hours using a poster that said, "Meet your new Manager, Tara Hartigan."  Plaintiff received no notification that this would be happening, and it was extremely awkward and humiliating for Plaintiff, the employees, and some of the customers who know Plaintiff well.

122. At no time, including on a call Plaintiff had <u>the day before</u> with Taylor, did Taylor tell Plaintiff that Tara was going to announce herself as the new manager of her store and hold a meet and greet with customers. Indeed, Tara Hartigan was extremely surprised that Plaintiff and her store did not know. This was yet another example of Taylor deliberately trying to humiliate and mistreat Plaintiff.

123. On December 1, 2017, the Greens Farms Store was closed. This was the only store in the Fairfield County Region to close and was the first store closing in Taylor's region in over a year. At 3:20 p.m. Taylor sent an e-mail to Plaintiff asking her to call him. Taylor stated that he had intended to stop by the store that day to say Good Bye and Thank You, but he ran out of time.

124. Plaintiff suffered and continues to suffer extreme ongoing stress and anxiety as a result of the hostile, discriminatory and retaliatory work environment. Plaintiff experiences trouble sleeping and is depressed. She is also experiencing appetite and weight loss due to the work related stress. As a result of this stress and anxiety, Plaintiff is receiving psychological treatment.

## V.  COUNT ONE: AGE DISCRIMINATION PURSUANT TO CONNECTICUT'S FAIR EMPLOYMENT PRACTICES ACT (CFEPA)

125. The allegations of paragraphs 1-124 are incorporated herein by reference.

126. Plaintiff can successfully establish a prima facie case of age discrimination in violation of CFEPA.

127. Plaintiff, age 57, is a member of the protected class.

128. Plaintiff was at all relevant times a highly qualified and respected employee of the Defendant, with  30 years of industry experience and consistently positive performance reviews.

129. Plaintiff was subjected unequal treatment and to a series of continuous adverse employment actions on account of her age, as described herein above, including but not limited being held to a different higher standard than younger similarly situated employees, being

disparately and unfairly evaluated and disciplined, being denied internal opportunities for advancement, being set up to fail by being transferred to an underperforming bank branch that was poised to close down, and being placed on an unwarranted PIP as a set up for failure and in order to push her out, and ultimately being terminated.

130.    On information and belief, Defendant has a known pattern and practice of favoring and giving preferential treatment to younger similarly situated employees over older employees. Defendant would use unequal and factually baseless performance criteria and techniques which targeted older employees with the goal of denying them opportunities, disciplining them, forcing them to quit their employment or develop a for cause basis to terminate their employment, while substantially younger and similarly situated employees were not treated in the same manner.

131.    The discrimination exhibited toward Plaintiff was continuous and represented an ongoing practice and policy of discrimination.

132.    Defendant did not have a legitimate basis for this treatment as Plaintiff consistently received positive performance reviews.  Defendant's proffered reasons for the adverse actions are pretextual or false and as such create an inference of discrimination.

133.    Plaintiff was denied equal treatment in the terms, conditions and privileges of her employment on account of her age.

134.    Defendant should be held liable for discriminating against Plaintiff on account of her age, in violation of the CFEPA.

## VI.    COUNT TWO: CFEPA RETALIATION

135.    The allegations of paragraphs 1-134 are incorporated herein by reference.

136.     Plaintiff can successfully establish a prima facie case of CFEPA retaliation. Plaintiff is more than 40 years of age.  Defendant treated Plaintiff different than similarly situated employees who were substantially younger.

137.     Plaintiff complained to her employer, her supervisors and HR of the ongoing discriminatory and disparate treatment.

138.     The discrimination exhibited toward Plaintiff was continuous and represented an ongoing practice and policy of discrimination.

139.     Since and immediately after Plaintiff complained regarding the discriminatory and disparate treatment she was facing, Defendant has retaliated against her by, amongst other things, placing her on a PIP and transferring her to a now defunct bank branch, which resulted in Plaintiff's termination.

140.     Defendant's ongoing and constant adverse treatment and actions against Plaintiff were in part, in retaliation for complaining about the discriminatory and disparate treatment.

141.     Defendant was aware of the age discrimination against Plaintiff and did nothing to prevent it.

142.     Plaintiff suffered an adverse employment actions in retaliation for complaining about the discriminatory and disparate treatment. Plaintiff was terminated from her employment substantially because of her age.

143.     Defendant should be held liable for retaliating against Plaintiff because of her complaints of age discrimination, in violation of the CFEPA.

**VII.     COUNT THREE: RETALIATION IN VIOLATION OF FAMILY AND MEDICAL LEAVE ACT (FMLA)**

144.     The allegations of paragraphs 1-143 are incorporated herein by reference.

145.    Plaintiff can successfully establish a prima facie case of retaliation in violation of the FMLA against Defendant by showing that: (1) she exercised her rights protected under the FMLA when she requested leave and went out on leave in relation to her daughter's illness and husband's death; (2) she was qualified for her position as evidenced by her positive performance reviews, praiseworthy feedback, impressive results and 30 years of industry experience; (3) she suffered adverse employment actions when she was placed on a baseless PIP and was ultimately terminated and (4) after taking leave she was treated with such extreme hostility by her supervisor, Kevin Taylor, that she was reduced to tears and otherwise berated and unfairly evaluated, resulting in her being placed on a baseless PIP and ultimately terminated. These adverse actions happened immediately after asserting her FMLA rights, giving rise to an inference of retaliation

146.    Defendant cannot and has not offered a legitimate non-discriminatory reason for the adverse actions taken against Plaintiff. Any proffered explanation by Defendant is a sham and pretext for unlawful retaliation

147.    Defendant should be held liable for retaliating against her in violation of the FMLA.

**VIII.    <u>COUNT FOUR: ASSOCIATIONAL DISABLITY DISCRIMINATION PURSUANT TO AMERICANS WITH DISABILITIES ACT (ADA)</u>**

148.    The allegations of paragraphs 1-147 are incorporated herein by reference.

149.    Plaintiff can successfully establish a prima facie case of associational disability discrimination against Defendant by showing that: that (1) the plaintiff was qualified for the job at the time of the adverse employment action; (2) the plaintiff was subjected to adverse employment action; (3) the plaintiff was known by her employer at the time to have a relative or associate with a disability; (4) the adverse employment occurred under circumstances raising a

reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

150.    Plaintiff was more than qualified for her job with Defendant.

151.    Plaintiff suffered multiple and repeated adverse employment action immediately after her employer was informed of her family's serious medical conditions, both of which occurred within a year's period of time.

152.    Defendant was informed and aware of Plaintiff's associated disabilities.

153.    Based on this associational disability, Defendant began to discriminate against Plaintiff and treat her adversely by placing her on a PIP, transferring her branch location which resulted in her termination, unfairly reprimanding and evaluating her and otherwise mistreating her.

154.    The discrimination exhibited toward Plaintiff was continuous and represented an ongoing practice and policy of discrimination.

155.    Given the timing of these acts, a causal connection exists between Defendant's adverse actions and the protected activity which make it clear that Plaintiff suffered the adverse action because of her association with individuals who have known disabilities, *i.e.* her husband and daughter.

156.    Defendant has not and can not offer a legitimate non-discriminatory reason for the adverse treatment. Based on Plaintiff's exemplary work and performance at Defendant and in the absence of a single negative review or issue, any reason proffered is not legitimate and a pretext for discrimination.

157.    Defendant should be held liable for discriminating against Plaintiff for her associational disability in violation of the ADA.

**IX**.    **COUNT FIVE: ASSOCIATIONAL DISABLITY DISCRIMINATION PURSUANT TO CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT (CFEPA)**

158.     The allegations of paragraphs 1-157 are incorporated herein by reference.

159.     Plaintiff can successfully establish a prima facie case of associational disability discrimination against Defendant by showing that: that (1) the plaintiff was qualified for the job at the time of the adverse employment action; (2) the plaintiff was subjected to adverse employment action; (3) the plaintiff was known by her employer at the time to have a relative or associate with a disability; (4) the adverse employment occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

160.     Plaintiff was more than qualified for her job with Defendant.

161.     Plaintiff suffered multiple and repeated adverse employment action immediately after her employer was informed of her family's serious medical conditions, both of which occurred within a year's period of time.

162.     Defendant was informed and aware of Plaintiff's associated disabilities.

163.     Based on this associational disability, Defendant began to discriminate against Plaintiff and treat her adversely by placing her on a PIP, transferring her branch location which resulted in her termination, unfairly reprimanding and evaluating her and otherwise mistreating her.

164.     The discrimination exhibited toward Plaintiff was continuous and represented an ongoing practice and policy of discrimination.

165.     Given the timing of these acts, a causal connection exists between Defendant's adverse actions and the protected activity which make it clear that Plaintiff suffered the adverse action because of her association with individuals who have known disabilities, *i.e.* her husband and daughter .

166.     Defendant has not and can not offer a legitimate non-discriminatory reason for the adverse treatment. Based on Plaintiff's exemplary work and performance at Defendant and in the absence of a single negative review or issue, any reason proffered is not legitimate and a pretext for discrimination.

167.     Defendant should be held liable for discriminating against Plaintiff for her associational disability in violation of the CFEPA.

## X.     COUNT SIX: RETALIATION PURSUANT TO AMERICANS WITH DISABILITIES ACT (ADA)

168.     The allegations of paragraphs 1-167 are incorporated herein by reference.

169.     Plaintiff can successfully establish a prima facie case of retaliation against Defendant by showing that: (1) she engaged in an activity protected under the ADA when she requested and took a leave of absence related to her daughter's and husband's respective disabilities; (2) Defendant was aware of this and was provided with substantial notice of Plaintiff's intention to take leave; (3) Defendant retaliated and took adverse action against Plaintiff when they placed Plaintiff on an unwarranted PIP and transferred her bank location, resulting in her termination and (4) a causal connection exists between Defendant's adverse actions and the protected activity given the timing of her making Defendant aware of the disabilities and taking leave for same, and the resulting retaliatory adverse actions taken upon her.

170.     Defendant cannot and has not offered a legitimate non-discriminatory reason for the adverse actions, in the absence of a single negative review or issue, any reason proffered is not legitimate and a pretext for discrimination.

171.     These actions constitute violations of the ADA.

172.     Defendant should be held liable for retaliating against Plaintiff for engaging in protected activity related to her associated disabilities.

**XI.** **COUNT SEVEN: RETALIATION PURSUANT TO CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT (CFEPA)**

173.    The allegations of paragraphs 1-172 are incorporated herein by reference.

174.    Plaintiff can successfully establish a prima facie case of retaliation against Defendant by showing that: (1) she engaged in an activity protected under the CFEPA when she requested and took a leave of absence related to her daughter's and husband's respective disabilities; (2) Defendant was aware of this and was provided with substantial notice of Plaintiff's intention to take leave; (3) Defendant retaliated and took adverse action against Plaintiff when they placed Plaintiff on an unwarranted PIP and transferred her bank location, resulting in her termination and (4) a causal connection exists between Defendant's adverse actions and the protected activity given the timing of her making Defendant aware of the disabilities and taking leave for same, and the resulting retaliatory adverse actions taken upon her.

175.    Defendant cannot and has not offered a legitimate non-discriminatory reason for the adverse actions, in the absence of a single negative review or issue, any reason proffered is not legitimate and a pretext for discrimination.

176.    These actions constitute violations of the CFEPA.

177.    Defendant should be held liable for retaliating against Plaintiff for engaging in protected activity related to her associated disabilities.

**XII.** **COUNT EIGHT: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

178.    The allegations of paragraphs 1-177 are incorporated herein by reference.

179.    Plaintiff can successfully establish a prima facie case of intentional infliction of emotional distress against Defendant by showing that: (1) Defendant knew or should have known that emotional distress was a likely result of its discriminatory and retaliatory conduct towards Plaintiff; (2) Defendant's intentional discriminatory and retaliatory conduct resulted in

Plaintiff's wrongful and unlawful termination; (3) Defendant's conduct caused Plaintiff extreme emotional distress.

180.    Defendant's persistent and pervasive conduct and treatment of Plaintiff, in particular by Defendant employee, Kevin Taylor, was intentional and so severe that Defendant should have known that it would result in extreme emotional distress, and in fact it did result in Plaintiff's extreme emotional distress.

181.    Defendant should be held liable for intentional infliction of emotional distress on Plaintiff.

## XIII.   COUNT NINE: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

182.    The allegations of paragraphs 1-181 are incorporated herein by reference.

183.    Plaintiff can successfully establish a prima facie case of negligent infliction of emotional distress against Defendant by showing that: (1) Defendant's conduct, in particular the conduct of Defendant employee, Kevin Taylor, created an unreasonable risk of causing Plaintiff emotional distress; (2) Plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness and (4) Defendant's conduct was the cause of Plaintiff's distress.

184.    Defendant should be held liable for negligent infliction of emotional distress on Plaintiff.

## XIV.   COUNT TEN: FAILURE TO PAY WAGES PURSUANT TO FLSA

185.    The allegations of paragraphs 1-183 are incorporated herein by reference.

186.    Plaintiff can successfully establish that Defendant has willfully and intentionally denied her wages to which she is owed pursuant to the FLSA.

187.    During the entire course of Plaintiff's employment with Defendant, she was required to spend a substantial amount of her time performing tasks that fell outside the scope of her managerial position. Even though Plaintiff was a "Manager", she was left without an Assistant

Manager and insufficient staff in more junior and administrative roles. As a result, she was reduced to operating as an Assistant Manager, Assistant Teller, along with her usual managerial tasks. In these roles, she regularly worked seven days a week of 50 hours or more.

188. Plaintiff was not paid overtime or otherwise compensated for her additional work days and hours that were required of her.

189. Plaintiff does not fall under any exceptions or exemptions that would exclude her from or deny her right to overtime compensation.

190. Defendant imposed this overtime work on Plaintiff and knowingly and intentionally did not pay Plaintiff for this overtime.

191. Plaintiff is owed back wages as well as liquidated damages and attorney fees for Defendant's wage violations.

192. Defendant should be held liable for intentionally failing to pay Plaintiff' her wages.

## XV.      COUNT ELEVEN: FAILURE TO PAY WAGES PURSUANT TO CT WAGE AND HOUR LAW

193. The allegations of paragraphs 1-192 are incorporated herein by reference.

194. Plaintiff can successfully establish that Defendant has willfully and intentionally denied her wages to which she is owed pursuant to CT Department of Labor Wage and Hour laws.

195. During the entire course of Plaintiff's employment with Defendant, she was required to spend a substantial amount pf her time performing tasks that fell outside the scope of her managerial position. Despite the fact that Plaintiff was a "Manager", she was left without an Assistant Manager and insufficient staff in more junior and administrative roles. As a result, she was reduced to operating as an Assistant Manager, Assistant Teller, along with her usual managerial tasks. In these roles, she regularly worked seven days a week of 50 hours or more.

196. Plaintiff was not paid overtime or otherwise compensated for her additional work days and hours, that were required of her.

197. Plaintiff does not fall under any exceptions or exemptions that would exclude her from or deny her right to overtime compensation.

198. Defendant imposed this overtime work on Plaintiff and knowingly and intentionally did not pay Plaintiff for this overtime.

199. Plaintiff is owed back wages as well as liquidated damages and attorney fees for Defendant's wage violations.

200. Defendant should be held liable for intentionally failing to pay Plaintiff' her wages.

## XVI. <u>COUNT TWELVE: HOSTILE WORK ENVIRONMENT</u>

201. The allegations of paragraphs 1-200 are incorporated herein by reference.

202. Plaintiff was subjected to a hostile work environment by Defendant.

203. Plaintiff will be able to successfully show that the environment at her employment was subjectively and objectively hostile and abusive and that the hostile and abusive behavior was the result of Defendant's discriminatory motives and animus.

204. The hostile and abusive conduct was severe and pervasive and interfered with the conditions of Plaintiff's employment.

205. Plaintiff raised her concerns regarding her supervisor Kevin Taylor's humiliating and intimidating conduct to HR and to Kevin Taylor directly.

206. Despite multiple communications to HR reporting this hostile behavior, Defendant ignored Plaintiff's complaints and did not take steps to correct it.

207.    Plaintiff attributes Kevin Taylor's hostile behavior towards her to not only his

discriminatory motives and animus, but also to the fact that Plaintiff was privy to certain

compromising information related to Kevin Taylor's sexual activities within the company.

208.    Defendant should be held liable for hostile work environment.

## XVII. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Suzanne Glicklin hereby requests the following relief:

A.    Award compensatory damages;

B.    Award punitive damages;

C.    Award attorneys' fees and costs;

D.    Award pre-judgement interest;

E.    Award post-judgement interest;

F.    Award such other relief in law or equity as this Court deems appropriate.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff respectfully requests a jury trial on all questions of fact raised by her Complaint.

Respectfully Submitted,
PLAINTIFF
SUZANNE GLICKLIN

By:＿＿/s/＿＿＿＿＿＿＿＿＿＿＿＿＿
Mark P. Carey (ct17828)
Elizabeth W. Swedock (ct28907)
Carey & Associates, P.C.
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150 tel
(203) 255-0380 fax
mcarey@capclaw.com
eswedock@capclaw.com

# EXHIBIT A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Suzzanne Glicklin**<br>**101 Royals Court**<br>**Trumbull, CT 06611** | From: | **Boston Area Office**<br>**John F. Kennedy Fed Bldg**<br>**Government Ctr, Room 475**<br>**Boston, MA 02203** |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **523-2018-00639** | **Anthony M. Pino, Jr.,**<br>**Enforcement Supervisor** | **(617) 565-3192** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

- [X] More than 180 days have passed since the filing of this charge.

- [ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

- [X] The EEOC is terminating its processing of this charge.

- [ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

- [X] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

- [ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

**Feng K. An,**
**Area Office Director**

FEB 2 0 2019

*(Date Mailed)*

Enclosures(s)

cc:

    **TD BANK, N.A.**
    **203 Trumbull Street**
    **Hartford, CT 06103**

**Elizabeth W. Swedock, Esq.**
**MARK P CAREY LLP**
**71 Old Post Rd., Suite One**
**Southport, CT 06890**

# EXHIBIT B

Suzanne Glicklin
**COMPLAINANT**

CHRO No. <u>1820328</u>

vs.

<u>TD Bank, N.A.</u>
**RESPONDENT**

## <u>RELEASE OF JURISDICTION</u>

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at <u>ROJ@ct.gov</u> or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

<u>The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.</u>

**DATE:** <u>February 19, 2019</u>

Tanya A. Hughes, Executive Director

Service:
**Complainant's Attorney**: Elizabeth W. Swedock, Esq. (Via Email <u>eswedock@capclaw.com</u>)
**Respondent's Attorney:** Elizabeth R. McKenna, Esq. (Via Email – <u>emckenna@littler.com</u>)